Burket, J.
This case was orally argued before the second division of the court, and there being a slight difference of opinion, the case was reserved to the full bench, and carefully considered upon the record and printed briefs. •
In the year 1841 the city of Cincinnati granted to James F. Conover and his associates a franchise to use the streets, lanes, commons and alleys of the city for the purpose of supplying-gas light. The ordinance by which this franchise was granted was, in the course of its passage, amended in several respects, and, as finally passed, the second section reads as follows :
“That, in consideration of the privileges hereby granted to the said Conover, his associates, their heirs, assigns, and successors, they, the said Conover, his associates, their heirs, assigns, or successors, shall furnish to the city on the several streets, lanes, commons and alleys, in which the leading or main pipes for supplying the citizens with' gaslight shall be laid and in use, such quantity of' gas as. may be required by the city council for public lamps at two-thirds of the lowest average price at which gas shall or may be furnished to private individuals in the cities of New Orleans, Baltimore, New York, Louisville and Pittsburg, the *281 lamp posts, connecting' pipes, meters and lamps being furnished by and at the expense of the said city.”
■ The' controversy arises over the proper construction of so much of this section as compels the Gas Company to furnish to the .city “such quantity of gas as may be required by the city council for public lamps at two-thirds of the lowest average price at which gas shall or may be furnished to private individuals in the cities of New Orleans, Baltimore, New York, Louisville and Pittsburg.
In May and June, 1890, there were in New York seven different companies, four of which furnished gas to private individuals at $1.25, and three at $1.60. In Pittsburg there were five companies, two of which furnished gas at $1.00, one at $1.50, one at $1.30, and one at $1.20. In New Orleans there were two companies furnishing' gas at $1.85 and at $3.00. In Louisville there were two companies, each furnishing gas at $1.35, and- in Baltimore there was only one company, furnishing gas at $1.25.
The Cas Company insist that a proper construction of the contract is to add together the seven prices in New York and divide the amount by •seven, and that the quotient will be the New York price. Also, add togther the five prices in Pitts-burg, divide the amount by five, and the quotient will be the Pittsburg' price. Also add together the two prices at New Orleans, divide the amount by two, and the quotient will be the New Orleans price. Louisville has but one price, and Baltimore but one. Then add this New York price, this Pittsburg price, this New Orleans price, the Louisville price and Baltimore price together, and *282 divide the amount by five, and the quotient will be the “lowest averaged price ” of the five cities.
The bills for May and June, 1890, were made out upon this basis, and the Gas Company insists that this is the correct construction of the contract.
The city did not receive and pay for gas under this contract until the year 1866, but from that date until May, 1890, the city received gas under this contract and paid the bills of the Gas Company, made out and averaged from time to time in the same manner as the bills in dispute. Prom 1841 to 1866 the Conover contract was kept alive, but gas was received and paid for under special contracts.
After the city began to receive gas under this Conover contract in 1866, there was some question made by the city authorities as to the manner of arriving at the lowest averag'ed price. Some of the companies allowed discounts for prompt payment, and the city claimed the benefit of such discounts in fixing the lowest averaged price. Robert Brown was officially connected with the Gas Company from 1866 to 1882, and he testified that the average was made during all that time without taking into consideration the discounts, and that the average price was ascertained in the manner now claimed by the Gas Company.
What he said about the matter is condensed by counsel for the Gas Company in their brief, and the same is here adopted as a fair epitome of the facts from 1866 to 1882, as follows :
“After stating then that it was part of his duty to collect the bills against the city, he said he was required to go to the city engineer, to the city *283 clerk and the city auditor, before the latter would approve the bill, and then the money was paid by the city treasurer, and that at various times the bills were disputed upon different grounds. He said: ‘In this particular matter of discounts there were several times, * * * probably ten or a dozen times, * * * I think it probably arose in the very first bill. * * * Mr. Tatem * * * was the city auditor. He raised the question when the first bill was rendered, * * * the bill was then rendered for the quarter’s term, * * * he raised that question about the discount and also about the question of lowest average. ’ After so stating, he said this question of the lowest average was raised at other times, as officers changed, and our bills would be delayed in settlement until they could investigate that question. He also stated that the city officers were told what the prices were and these discounts. In some cases they inquired for themselves. That these inquiries were so made, both in the five cities and at the gas office, and inf ormation obtained from both sources.”
From 1882 to 1887, the situation remained about the same. From December, 1887, to May 1890, the bills for gas under the contract, were audited and paid by the city, and received by the Gas Company without prejudice to either party as to the proper construction of the contract, as shown by the following, written upon each bill :
“The above claim has been duly approved by the Board of Public Affairs, at the regular meeting of December 31, 1887, and its payment- by the comptroller authorized by them, upon condition that it shall in no respect affect any claim by either party concerning any matter now in dispute, *284 in relation to the proper construction of the clause of the Conover contract with regard to the price of gas. ' (Signed),
“Thomas G. Smith, President.
“Attest: D. W. Brown, Qlerk.”
Also, by the following receipt given for the warrant received in payment of each bill:
“Received of the comptroller his warrant foi $16,190.23, for gas consumed in public lamps during the month of December, 1887, which is accepted by the Cincinnati Gas-Light and Coke Company, upon condition that it shall in no respect affect any claim by either party concerning any matter now in dispute in relation to the proper construction of the clause in the Conover contract with regard to the charge for gas. (Signed),
“The Cincinnati Gas-Light & Coke Co.,
“Per D. G. A. Davenport.”
The Gas Company claims that this course of dealing, between the city and itself, furnishes a practical construction of the contract by which the city is now bound. The full claim of the Gas Company is, that its construction is the proper one, but that if it is not, then that the contract is ambiguous, and that the city is bound by the practical construction so furnished by the course of dealing in its performance of the contract.
It is conceded by counsel for the Gas Company, that if the contract is nokambiguous, that it must be enforced according to its terms, without regard to the construction heretofore placed upon it by the parties in the course of its performance.
In determining the rights of parties under a written contract, it is not the duty of a court to seek for, or create doubts and ambiguities, but *285 rather to avoid them, and construe and enforce the contract according to its evident meaning, giving force to every word.
When this course is pursued in this case, it is clear that the “lowest averaged price” here means the lowest price in each city, averaged. This is the plain, .common import of the words used, and the only reasonable construction in which any force can be given to the word “lowest.”
There is no force in the contention of the Gas .Company that gas furnished to private individuals, means all the individuals in the particular city, and that therefore all must be taken into consideration in order to fix the price in such city. The consolidated company of New York furnishes gas to private individualsat $1.25. No other company furnishes it at a lower rate. This rate therefore fills the terms of the contract, no matter if there are other companies furnishing’ gas at the same, or a higher rate.
There is by far less difficulty in thus construing this contract, than there would be in arriving at a satisfactory conclusion as to the proper effect which should be given to the course of dealing which it is claimed gives a practical construction to the contract. By the epitome of facts above taken from the brief of defendant in error, it appears that at various times the bills were disputed upon different grounds, and in the receipts given by the Gas Company for the different, warrants received in payment of bills from December, 1887, to May, 1890, it is conceded that there is a dispute between the parties as to the proper construction of the Conover contract. The course of dealing relied upon to establish a practical construction, is therefore much more ambiguous than the contract *286 itself, and can furnish no safe g’uide for a construction different from the words themselves.
There is some looseness of expression in some of the reported cases as to what course of dealing will supply a practical construction. The case of Robinson v. U. S., 13 Wall., 363, cited and relied upon in Central Trust Co. v. Wabash, St. L. & P. Ry., 34 Fed. Rep., 256, as a case of practical construction, is a case involving' the admission of evidence as to the existence of a custom in trade, and is not at all founded upon the doctrine of practical construction.
To have any value as a practical construction, the course of dealing- should be uniform, unquestioned, and fully concurred in by both parties. A right claimed by one party, and from time to time denied or disputed by the other, though- for the time being, conceded, cannot from such concessions, be regarded as established. And when, as in this case, each concession for over two years is coupled with an admission by both parties that the right claimed is in dispute, it is clear that such concessions cannot be used to establish the right.
It is not every captious doubt as to the meaning of a written instrument, that will warrant a court in concluding that the instrument is ambiguous, and therefore to disregard its words, and seek the intention of the parties in the course of business growing out of an attempted performance.
The most exact and skillfully drawn document, may, by able counsel, be so construed as to create what would seem to be reasonable doubts, when in fact it is perfectly clear to the parties, and, aside from thé strained construction of counsel, also to the court. In such cases it is the duty of courts *287 to disregard the strained construction of counsel, and to enforce the instrument according to the the reasonable, plain and manifest intention of the parties. Business does not usually deal in fine drawn distinctions, but in plain, practical transactions.
The reason of the rule of practical construction has its origin in the presumption that the parties to the contract, at and after the making thereof, knew what they meant by the words used, and that their acts and conduct in the performance thereof, are consistent with their knowledge and understanding, and that therefore their acts and conduct show the sense in which the words were used and understood by them. In such cases acts sometimes speak louder than words. But the reason of the rule ceases, when the acts or conduct are not those of the parties who made the contract, and are not presumed to know in their own minds what was in fact meant by the words used. The acts and conduct of the parties following after the parties who made the contract, must in the nature of the case be only their own construction of the words used, and not an acting out of the understanding of the words by the parties who used them. The same is true of public officers. They may put their own construction upon the words used, but in so doing they are not acting out the mental understanding of the sense in which the words were used by those who made the contract or written instrument.
In such cases the acts and conduct of the parties in the perform anee of the contract, are only their construction of the meaning of the words used; and their construction of words used by others, should not override the construction to be placed thereon by the courts. So that while the *288 practical construction of the contract by the parties ' who made it, is entitled to great weight, in case of doubt, the construction placed thereon by those who follow is of much less weight.
We think therefore, that in the case at bar, there is no such practical construction by the parties, as should change the import of the words used in the Conover contract, and that the meaning- of the words is sufficiently plain to permit the court to enforce the contract according to the evident import.
The t-lowest averaged price,” stipulated for in. the contract, entitles the city to the benefit of such discounts as are, or may be,-allowed to individuals by the company in each city furnishing gas at the lowest price. The terms being once settled and understood, the city becomes a cash paying customer, entitled to all discounts made for cash. The delay in payment since May, 1890, was caused by the unwarranted claim of the Gas Company, and not by the want of cash on part of the city with which to make payment. Hence, the city is entitled to the discounts since May 1, 1890.
It is evident that the question of candle power did not enter into the terms of the contract when made, and- has not become since injected therein. In New Orleans there are two companies, one furnishing gas to private individuals' at $3.70, and the other at $3.00 with 20 per cent, discount. The price certified to the Cincinnati Gas Company by the New Orleans company, was $1.85 instead of $3.70. This was done by reason of the increased candle power of the New Orleans company, but defendant in error, had no knowledge of this reduction in price, and the bills in dispute were made out with reference to the price of $1.85, as reported *289 by the New Orleans company. The company which supplies g’as to the private individuals at New Orleans at $3.00 with 20 per cent, discount, making $2.40 net, is the one to be considered in making up the “lowest averaged price” in this case. At New York the lowest price is $1.25, at Baltimore $1.25, at Pittsburg $1.00, and at Louisville $1.35, with five per cent, discount, making $1,291 net. These prices constitute the basis for making up the bills for May and June 1890, and the same principle will prevail as to all bills for gas thereafter.
The claim, of the city on the cross-petition is not allowed, and the judgment of the courts below were correct as to that claim, notwithstanding the stipulation, that the warrant was signed “upon condition that it shall in no respect affect any claim by either party concerning any matter now in dispute in relation to the proper construction of the clause in the Conover contract with regard to the charge for gas,” the payment was voluntary and not compulsory.' The condition is that it shall not affect the claim of either party as to the proper construction of the contract; not that in case of a construction in favor of the city that the Gas Company will repay the money. The right sought to be saved by this condition, is the right as to the construction of the contract, and not as to the repayment of the money after the proper construction shall have been settled and determined. If there was any mistake as to the payment made, such mistake was a mistake of law and not of fact.
The payments were also voluntary, and there is therefore a double reason why there should be no recovery back.
The judgment of the circuit court is reversed, and proceeding to render such judgment as the *290 circuit court should have rendered, the judgment of the common pleas court in favor of the Gas Light and Coke Company on its cause of action is reversed, and the judgment against the city of Cincinnati on its cross-petition is affirmed, and this cause is remanded to the court of common pleas for a new trial, upon the cause of action of defendant in error, against plaintiff in error.

Judgment reversed.